STATE OF CONNECTICUT *v.* ALBERT P. DEANGELIS, JR.
(12127)

HEALEY, SHEA, DANNEHY, SANTANIELLO and CALLAHAN, JS.

Argued February 4—decision released June 17, 1986

*John J. Keefe, Jr.,* with whom, on the brief, were *Hugh F. Keefe* and *Charles E. Tiernan III,* for the appellant (defendant).

*Julia DiCocco Dewey,* assistant state's attorney, with whom, on the brief, were *Arnold Markle,* state's attorney, *Michael Dearington,* assistant state's attorney, and *David Teitelman,* legal intern, for the appellee (state).

CALLAHAN, J. The defendant was charged in an indictment with the crime of murder in violation of General Statutes § 53a-54a (a). The charge resulted from the stabbing death of his grandmother, Antoinette DeAngelis, with whom he shared an apartment at 10 Clark Street in New Haven. After a jury trial the defendant was convicted of the lesser included offense of manslaughter in the first degree in violation of General Statutes (Rev. to 1979) § 53a-55 (a) (2),[1] and was sentenced to a term of imprisonment of not less than seven and one-half years nor more than fifteen years.

On appeal the defendant claims that the trial court erred in: (1) finding the defendant competent to stand trial; (2) refusing to suppress certain statements of the defendant; (3) allowing the state to cross-examine a character witness concerning his knowledge of a complaint made to the New Haven police by the defendant's father; and (4) denying the defendant's motion for an examination to determine his competency to be sentenced. We find no error.

[1] "[General Statutes (Rev. to 1979)] § 53a-55 (a) (2) provides in pertinent part: Sec. 53a-55. MANSLAUGHTER IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person; or (2) with intent to cause the death of another person, he causes the death of such person or of a third person under circumstances which do not constitute murder because he acts under the influence of extreme emotional disturbance, as provided in subsection (a) of section 53a-54a, except that the fact that homicide was committed under the influence of extreme emotional disturbance constitutes a mitigating circumstance reducing murder to manslaughter in the first degree and need not be proved in any prosecution initiated under this subsection . . . ."

The jury could reasonably have found the following facts: At approximately 8:30 a.m. on November 21, 1979, the defendant's mother, Norma DeAngelis, arrived for work at the DeAngelis family market which is located in the same block as 10 Clark Street. While she was pulling her car into the parking area behind the market, the defendant motioned her to a stop and told her something had happened to his grandmother who resided with him. The defendant's mother went into the defendant's apartment, saw the victim's body on the kitchen floor and returned outside where she again spoke to the defendant. At that time, he told his mother that he had been out all night and had just returned and found his grandmother's body. The defendant's mother telephoned another son, Norman DeAngelis, at his home and then called the 911 emergency number. Police and fire department personnel responded to the call at approximately 9 a.m. and went to the first floor apartment at 10 Clark Street. When they entered the apartment, they found the body of seventy-eight year old Antoinette DeAngelis lying on the kitchen floor in a pool of blood. A steak knife was observed near the body. Death was caused by a stab wound to the neck. It appeared that the victim had been killed while she was preparing breakfast. There was no evidence of a forced entry to the apartment or that the apartment had been ransacked.

Two residents in the apartment building had heard the victim scream at about 7:30 that morning. Another neighbor saw the defendant leave his apartment at about 10 o'clock the previous night wearing dark clothes and next saw him the morning of November 21 at about 8 a.m. wearing different clothing. When the police arrived, the defendant, neatly dressed, was pacing in a parking area adjacent to 10 Clark Street. Clothing later seized from the defendant's room had blood stains on it consistent with the victim's blood and incon-

sistent with his own. The defendant on appeal does not challenge the sufficiency of the evidence to sustain a conviction.

I

The defendant's first claim is that the trial court erred by finding him competent to stand trial. Prior to trial, the defendant, by order of the court pursuant to General Statutes (Rev. to 1983) § 54-56d (d),[2] was examined by Wayne Fenton, a resident in psychiatry at Yale-New Haven Hospital, to determine his competency to stand trial. At a pretrial hearing before the court, *Fishman, J.,* Fenton testified that his examination of the defendant revealed that the defendant was suffering from a major psychiatric or psychotic disorder. The witness concluded, however, that as long as the defendant received his prescribed medication he was able to understand the charges against him and to assist in his own defense and was therefore competent to stand trial.

[2] "[General Statutes (Rev. to 1983)] Sec. 54-56d. (Formerly 54-40). COMPETENCY TO STAND TRIAL. (a) COMPETENCY REQUIRED. DEFINITION. A defendant shall not be tried, convicted or sentenced while he is not competent. For the purposes of this section, a defendant is not competent if he is unable to understand the proceedings against him or to assist in his own defense.

"(b) PRESUMPTION OF COMPETENCY. A defendant is presumed to be competent. The burden of proving that the defendant is not competent by clear and convincing evidence and the burden of going forward with the evidence are on the party raising the issue. The burden of going forward with the evidence shall be on the state if the court raises the issue. The court may call its own witnesses and conduct its own inquiry.

"(c) REQUEST FOR EXAMINATION TO DETERMINE COMPETENCY. If at any time during a criminal proceeding it appears that the defendant is not competent, counsel for the defendant or for the state, or the court, on its own motion, may request an examination to determine the defendant's competency.

"(d) EXAMINATION OF DEFENDANT. REPORT. If the court finds that the request for an examination is justified and that, in accordance with procedures established by the judges of the superior court, there is probable cause to believe that the defendant has committed the crime for which he is

At the same pretrial hearing the defendant produced as witnesses Susan Duffy, Jeremy August, and Joseph Gaspari, all of whom were psychiatrists who had treated the defendant. August and Gaspari, however, had not treated him for approximately a year prior to the date of the hearing. Duffy, August and Gaspari testified that the defendant had a mental illness which was

charged, the court shall order an examination of the defendant as to his competency. The court either may appoint one or more physicians specializing in psychiatry to examine the defendant or it may order the commissioner of mental health to conduct the examination either by a clinical team consisting of a physician specializing in psychiatry, a clinical psychologist and a psychiatric social worker, or by one or more physicians specializing in psychiatry. If the commissioner of mental health is ordered to conduct the examination, he shall select the members of the clinical team or the physician or physicians. If the examiners determine that the defendant is not competent, they shall then determine whether there is substantial probability that the defendant, if provided with a course of treatment, will regain competency within the maximum period of any placement order under this section. The court may authorize a physician specializing in psychiatry, a clinical psychologist or a psychiatric social worker selected by the defendant to observe the examination. Counsel for the defendant may observe the examination. The examination shall be completed within fifteen days from the date it was ordered. The examiner or examiners shall file a written report with the court at the completion of the examination. On receipt of the written report, the clerk of the court shall cause copies to be delivered immediately to the state's attorney and to counsel for the defendant.

"(e) HEARING. WAIVER. The court shall hold a hearing as to the competency of the defendant no later than ten days after it receives the written report. Any evidence regarding the defendant's competency, including the written report, may be introduced at the hearing by either the defendant or the state. If the written report is introduced, at least one of the examiners must be present to testify as to the determinations in the report, unless his presence is waived by the defendant and the state. Any member of the clinical team shall be considered competent to testify as to the team's determinations. A defendant and his counsel may waive the court hearing only if the examiners, in the written report, determine without qualification that the defendant is competent.

"(f) CONTINUATION OF CRIMINAL PROCEEDINGS. If the court, after the hearing, finds that the defendant is competent, it shall continue with the criminal proceedings. If it finds that the defendant is not competent, it shall also find whether there is substantial probability that the defendant, if provided with a course of treatment, will regain competency within the maximum period of any placement order permitted under this section. . . ."

properly diagnosed as chronic paranoid schizophrenia and they described his symptoms. None of the three, however, rendered an opinion as to whether the defendant was, at that time, competent to stand trial. Robert S. McWilliams, who was a resident in psychiatry at Yale-New Haven Hospital and employed as a psychiatrist at the Veterans Administration Hospital in West Haven, was also a witness at the pretrial hearing. He testified that he had treated the defendant and had seen him the night before the hearing in group therapy. McWilliams opined that the defendant could not fully understand the proceedings and was not competent to stand trial. McWilliams rendered his opinion with the reservation that he had not done a thorough psychiatric examination for the purpose of determining the defendant's competency to stand trial. On cross-examination, McWilliams testified he had never performed a competency examination pursuant to General Statutes § 54-56d (d), admitted he did not feel qualified to do such an examination, and would seek guidance if asked to do one. He testified he based his opinion on knowledge of the defendant gained while treating him.

An accused is not competent to stand trial "if he is unable to understand the proceedings against him or to assist in his own defense." General Statutes (Rev. to 1983) § 54-56d (a); see *State* v. *Pastet,* 169 Conn. 13, 26, 363 A.2d 41, cert. denied, 423 U.S. 937, 96 S. Ct. 297, 46 L. Ed. 2d 270 (1975). Competence to stand trial is a legal question which must ultimately be determined by the trial court. General Statutes § 54-56d (f); see *United States* v. *Hoog,* 504 F.2d 45, 49 (8th Cir. 1974); *United States* v. *Davis,* 365 F.2d 251, 256 (6th Cir. 1966); *Lyles* v. *United States,* 254 F.2d 725, 730 (D.C. Cir. 1957); *United States* v. *Turner,* 602 F. Sup. 1295, 1311 (S.D.N.Y. 1985); *State* v. *Pastet,* supra, 26. It is not a question to be determined by the number of psy-

chiatrists testifying for or against a particular position. *State* v. *Ontra,* 178 Conn. 480, 484, 423 A.2d 134 (1979). The trial court is entitled to evaluate the conflicting testimony and consider the basis of the opinions of the expert witnesses. *State* v. *Perez,* 182 Conn. 603, 610, 438 A.2d 1149 (1981). In this case, although Duffy, August, Gaspari and McWilliams were familiar with the defendant's condition, they had not examined him for the purpose of determining his competence to stand trial. Further, none of the four appears to have had any experience in making that determination. Fenton, on the other hand, was appointed by the court for that specific purpose and had considerable experience in that area.

The expert psychiatric testimony at the pretrial hearing pointed toward a conclusion that the defendant suffered from a mental disorder diagnosed as chronic paranoid schizophrenia. Competence to stand trial, however, is not defined in terms of mental illness. An accused may be suffering from a mental illness and nonetheless be able to understand the charges against him and to assist in his own defense; *Lee* v. *Alabama,* 406 F.2d 466, 471–72 (5th Cir. 1969); and the fact that the defendant was receiving medication and would require medication during the course of the trial does not render him incompetent. *State* v. *Hampton,* 253 La. 399, 403, 218 So. 2d 311 (1969); *People* v. *Hardesty,* 139 Mich. App. 124, 144–45, 362 N.W.2d 787 (1984).

Notwithstanding the fact that the defendant called four psychiatrists and the state only one, the trial court was entitled to credit and rely on Fenton's testimony. "Despite the quantity of the defendant's evidence tending to show [incompetence], the weight to be given the opinion evidence of expert witnesses . . . is for [the trier of fact] to determine. *State* v. *Kenyon,* 134 Conn. 43, 49, 54 A.2d 585 (1947)." *State* v. *Ontra,* supra, 484; *State* v. *Vennard,* 159 Conn. 385, 404, 270 A.2d 837

(1970), cert. denied, 400 U.S. 1011, 91 S. Ct. 596, 27 L. Ed. 2d 625 (1971). The trial court did not err when it found the defendant competent to be tried.

## II

The defendant next claims that certain statements made to Officer Dean Runlett of the New Haven police department on November 21, 1979, which were admitted at trial, should have been suppressed because they were not made voluntarily. The defendant makes no claim that he was not informed of his *Miranda* rights or that a waiver of those rights could not have been found. Nor does he argue that he was illegally detained or abused, that physical or overt psychological force was exerted upon him or that any threats, promises or offers were made to him. This case is, therefore, readily distinguishable on its facts from *Culombe* v. *Connecticut,* 367 U.S. 568, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961), cited by the defendant. Rather the defendant argues that because of the length of his interrogation, his mental and physical condition, his emotional state, his limited intelligence, and his isolation, his will was overborne and his statements therefore could not be considered voluntary.

The evidence the defendant sought to suppress consisted principally of contradictory statements made by the defendant to Runlett concerning his activities on the night of November 20 and the early morning of November 21, 1979. Runlett testified that the defendant had told him that when he arrived home, after being out all night, he found his grandmother's body lying on the kitchen floor. The defendant later said, however, that when he had come home his grandmother prepared breakfast for both of them. Runlett also testified that the defendant told him he had been to a movie the previous evening, but later said he had stood outside the theatre and had not actually seen the show. The defendant

also told Runlett at one point that he had not stopped the previous night for food or drink but later said he had gone to a "Dunkin Donuts" for coffee. Runlett further testified that in commenting on the death of the victim the defendant had said, "I didn't mean for it to happen that way," but when asked to elaborate denied making the statement.

"The ultimate test of the admissibility of such statements is their voluntariness." *State* v. *Stankowski,* 184 Conn. 121, 131, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981). "The issue of whether [admissions are] voluntary and admissible is, in the first instance, one of fact for determination by the trial court in the exercise of its legal discretion." *State* v. *Derrico,* 181 Conn. 151, 162, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980); see *Jackson* v. *Denno,* 378 U.S. 368, 395, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964). Our usual deference to the trial court's finding on questions of this nature is qualified by the necessity for an independent examination of the entire record to determine whether the trial court's finding of voluntariness is supported by substantial evidence. *State* v. *Toste,* 198 Conn. 573, 576, 504 A.2d 1036 (1986); *State* v. *DeForge,* 194 Conn. 392, 398, 480 A.2d 547 (1984). The state is required to prove as a prerequisite to admissibility that, under all the circumstances, admissions by an accused were voluntarily made. *State* v. *Vollhardt,* 157 Conn. 25, 34, 244 A.2d 601 (1968). "In meeting that burden, the state need only prove voluntariness by a preponderance of the evidence, and need not satisfy the test of proof beyond a reasonable doubt. *Lego* v. *Twomey,* 404 U.S. 477, 489, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972)." *State* v. *Derrico,* supra, 162. " ' "[T]he test of voluntariness is whether an examination of all the circumstances discloses that the conduct of 'law enforcement officials was such as to overbear [the defendant's]

will to resist and bring about confessions not freely self-determined . . . . ' *Rogers* v. *Richmond,* 365 U.S. 534, 544, [81 S. Ct. 735, 5 L. Ed. 2d 760] (1961) . . . .'' ' '' *State* v. *Staples,* 175 Conn. 398, 408, 399 A.2d 1269 (1978); *State* v. *Derrico,* supra, 163. '' 'The ultimate test remains . . . . "Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." ' *Schneckloth* v. *Bustamonte,* 412 U.S. 218, 225, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973), quoting *Culombe* v. *Connecticut,* [367 U.S. 568, 602, 81 S. Ct. 860, 6 L. Ed. 2d 1037 (1961)].'' *State* v. *Derrico,* supra, 163. "Put another way, the [admission] must be the product of an essentially free and unconstrained choice by the maker." *State* v. *Devine,* 149 Conn 640, 653, 183 A.2d 612 (1962).

The testimony elicited at the pretrial suppression hearing was that the defendant was requested by Runlett to accompany him to police headquarters. The defendant agreed to do so and was driven to headquarters by Runlett who was in civilian clothes in an unmarked police vehicle. When the defendant arrived at police headquarters shortly before 10:30 a.m., he was read his *Miranda* warnings, read them himself and signed the back of the warning card. According to Runlett, the defendant was not a suspect, was not under arrest and would have been allowed to leave police headquarters at any time if he had expressed a desire to do so. The defendant's interview with Runlett lasted from approximately 10:30 a.m. until 9 o'clock that evening. It appears, however, that most of the statements sought to be suppressed had been made in the late morning or afternoon. During the day the defendant's mother and brother visited him and gave no indication that they wished the police to terminate

their discussion with the defendant. The defendant was cooperative and agreeable throughout the day and never indicated that he did not desire to continue. The interview was conducted in question and answer fashion with long pauses when nothing was said by either party. Topics other than the death of the defendant's grandmother were discussed. The defendant was offered food and drink on several occasions and although he declined food he was furnished coffee. Runlett was aware that the defendant had said that he had not slept the night before, but he testified the defendant appeared fresh and alert throughout the questioning. Runlett was also aware that the defendant had psychiatric problems, but testified that the defendant was coherent although he did break down emotionally and cried on two or three occasions.

At approximately 9 p.m., the defendant was asked by Runlett to give a formal written statement concerning what they had discussed during the interview. The defendant refused, saying that he wished to talk to a lawyer first. Shortly thereafter, at the request of his mother, the defendant was taken to Yale-New Haven Hospital for a psychiatric evaluation. He remained at the hospital for approximately thirty to forty-five minutes and was transported back to police headquarters where he was requested to submit to fingerprinting for comparison purposes. He refused to do so and left headquarters. He returned of his own volition the following day and was fingerprinted.

The defendant submitted, as an exhibit during the hearing on his motion to suppress, the report of Wayne Fenton dated April 13, 1982. The report had been prepared pursuant to a court ordered competency examination. Fenton's report concluded that although the defendant was suffering from a psychiatric disorder "he displays a good understanding of the proceedings against him and appears adequately able to assist his

attorney in his defense. While he has some cognitive impairment secondary to low intelligence and residual thought disorder, this is not so severe as to interfere with his ability to comprehend instruction and advice, make decisions, testify if necessary and maintain a collaborative relationship with his attorney." No medical evidence other than Fenton's report was submitted at the suppression hearing.

The mere fact that admissions are made by an accused after a long period of interrogation by a police officer does not necessarily mean those admissions are involuntary. *State* v. *Malm,* 142 Conn. 113, 120, 111 A.2d 685 (1955); *State* v. *Poole,* 44 N.C. App. 242, 248, 261 S.E.2d 10 (1979); 29 Am. Jur. 2d, Evidence § 529. Nor does the fact that the defendant was somewhat deficient in mental ability, had a psychiatric disorder, and was upset emotionally, necessarily render his statements inadmissible. *State* v. *Jones,* 193 Conn. 70, 84–85, 475 A.2d 1087 (1984); *State* v. *Poole,* supra, 248. The court must make a determination of voluntariness based on all the circumstances. *Gallegos* v. *Colorado,* 370 U.S. 49, 52, 55, 82 S. Ct. 1209, 8 L. Ed. 2d 325 (1962); *State* v. *Staples,* 175 Conn. 398, 408, 399 A.2d 1269 (1978).

In this case the trial court had evidence before it that the defendant went to and remained at police headquarters voluntarily, was visited by his mother and brother, was apparently well treated and was cooperative and coherent throughout the day. Further, at the end of the interview, he refused to give a written statement to the police and later refused to be fingerprinted. His refusals are persuasive evidence that, despite his deficiencies and the length of the questioning, the defendant was in control of the situation and his will was not subverted to that of his interrogator. We cannot say, therefore, that the trial court erred when it concluded that the defendant's admissions were voluntarily made and admitted them in evidence.

## III

The defendant also claims that the trial court erred in allowing the prosecutor to cross-examine his brother, Norman DeAngelis, concerning a complaint made to the New Haven police department by the defendant's father.

The defendant offered the testimony of his brother on direct examination to prove his claimed character trait of peacefulness and nonviolence. On cross-examination the state's attorney asked Norman DeAngelis: "Do you know whether your father filed a complaint with the New Haven Police Department on November 9, 1979, less than two weeks before the crime charged in this case wherein your father complained that the accused was acting very strangely and gets upset over anything that happens?" The witness answered that he did not. Objection was made to the question and an exception was taken to the court's ruling allowing it.

The question asked by the state's attorney is analogous to a question concerning specific acts of prior misconduct by an accused. Such a question may not be asked of a witness to elicit testimony that the defendant is a violent person in order to prove his guilt of the crime charged; *State* v. *DeFreitas,* 179 Conn. 431, 461, 426 A.2d 799 (1980); or to disprove the character trait in question. *State* v. *Turcio,* 178 Conn. 116, 126, 422 A.2d 749 (1979), cert. denied, 444 U.S. 1013, 100 S. Ct. 661, 62 L. Ed. 2d 642 (1980); *State* v. *Martin,* 170 Conn. 161, 163, 365 A.2d 104 (1976). The opinion of a witness who testifies that an accused is peaceful, passive and nonviolent, however, must have some basis and the state is allowed to test that basis. "When a character witness has given his opinion as to a particular trait, the state may cross-examine that witness

concerning specific acts, not to disprove the truth of such facts, but to test the credibility of the character witness by ascertaining his good faith, his source and amount of information and his accuracy." *State* v. *Martin,* supra, 164–65.

The obvious purpose of the state's question on cross-examination was to test the accuracy of Norman DeAngelis' assessment of the defendant's character and "the good faith with which he testified." *State* v. *Martin,* supra, 165; *State* v. *Turcio,* supra, 125–26. The witness had worked at the family market with the defendant and their father and being a family member was ostensibly in a position to know the family's affairs. His answer that he was unaware that his father had contacted the police concerning his brother's conduct might have caused the jury to believe that he was not cognizant of an important factor that could affect his assessment of the defendant's character. The defendant claims, however, that the question was not relevant because his father's complaint had nothing to do with peacefulness and nonviolence. Rather his father complained only that the defendant was "acting very strangely" and "getting upset." "When the prosecutor attacks the basis of the witness' opinion by questioning him as to knowledge of specific acts, such acts must be relevant to those traits." *State* v. *Martin,* supra, 165–66. It is, however, hard to imagine a father making a complaint to the police about his son unless he fears some dangerous action. The question was reasonably designed to elicit evidence of behavior on the part of the defendant which, if the witness were aware of it, would seriously discredit his opinion of the defendant's character as nonviolent and if he was not aware of it, the basis for his opinion.

The determination, on cross-examination, of the relevance of evidence to test the credibility and the basis of the opinion of a character witness must be made

according to reason and judicial experience. *State* v. *Turcio,* supra, 127. "In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. [Citation omitted.] Reversal is required only where . . . injustice appears to have been done." *State* v. *Brown,* 169 Conn. 692, 702, 364 A.2d 186 (1975). " '[T]he ultimate issue is whether the court could reasonably conclude as it did.' *DiPalma* v. *Wiesen,* 163 Conn. 293, 299, 303 A.2d 709 (1972)." *State* v. *Martin,* supra, 166. The trial judge must decide, in the exercise of judicial discretion, whether the probative value of the testimony elicited by the question on cross-examination outweighs the prejudice likely to result from its admission. *State* v. *Ralls,* 167 Conn. 408, 417, 356 A.2d 147 (1974); *State* v. *Moynahan,* 164 Conn. 560, 597, 325 A.2d 199, cert. denied, 414 U.S. 976, 94 S. Ct. 291, 38 L. Ed. 2d 219 (1973).

The defendant put his character in issue through his brother's direct testimony. We cannot say that the trial court abused its discretion in allowing the state to question the brother concerning the basis for his testimony and his good faith in testifying.

## IV

The defendant's final claim is that the trial court erred by denying his motion that he be examined to determine his competency to be sentenced. The defendant, after he was found guilty, did not move for an examination under General Statutes § 54-56d (c) to determine his competence. Rather he moved for an examination under General Statutes § 17-244.[3] The pur-

---

[3] "[General Statutes] Sec. 17-244. CERTAIN CONVICTED PERSONS TO BE EXAMINED. REPORT AND RECOMMENDATION. (a) Except as provided in section 17-255 any court prior to sentencing a person convicted of an offense for which the penalty may be imprisonment in the Connecticut Correctional Institution at Somers, or of a sex offense involving (1) physical force or violence, (2) disparity of age between an adult and a minor or (3) a sexual

pose of an examination under § 17-244 is not to determine competency to be sentenced. That section pre-

act of a compulsive or repetitive nature, may if it appears to the court that such person is mentally ill and dangerous to himself or others, upon its own motion or upon request of any of the persons enumerated in subsection (b) of this section and a subsequent finding that such request is justified, order the commissioner to conduct an examination of the convicted defendant by qualified personnel of the institute. Upon completion of such examination the examiner shall report in writing to the court. Such report shall indicate whether the convicted defendant should be committed to the diagnostic unit of the institute for additional examination or should be sentenced in accordance with the conviction. Such examination shall be conducted and the report made to the court not later than fifteen days after the order for the examination. Such examination may be conducted at a correctional facility if the defendant is confined or it may be conducted on an outpatient basis at the institute or other appropriate location. If the report recommends additional examination at the diagnostic unit, the court may, after a hearing, order the convicted defendant committed to the diagnostic unit of the institute for a period not to exceed sixty days, except as provided in section 17-245 provided the hearing may be waived by the defendant. Such commitment shall not be effective until the director certifies to the court that space is available at the diagnostic unit. While confined in said diagnostic unit, the defendant shall be given a complete physical and psychiatric examination by the staff of the unit and may receive medication and treatment without his consent. The director shall have authority to procure all court records, institutional records and probation or other reports which provide information about the defendant.

"(b) The request for such examination may be made by the state's attorney or assistant state's attorney who prosecuted the defendant for an offense specified in this section, or by the defendant or his attorney in his behalf. If the court orders such examination, a copy of the examination order shall be served upon the defendant to be examined.

"(c) Upon completion of the physical and psychiatric examination of the defendant, but not later than sixty days after admission to the diagnostic unit, a written report of the results thereof shall be filed in triplicate with the clerk of the court before which he was convicted, and such clerk shall cause copies to be delivered to the state's attorney and to counsel for the defendant.

"(d) Such report shall include the following: (1) A description of the nature of the examination; (2) a diagnosis of the mental condition of the defendant; (3) an opinion as to whether the diagnosis and prognosis demonstrate clearly that the defendant is actually dangerous to himself or others and requires custody, care and treatment at the institute; and (4) a recommendation as to whether the defendant should be sentenced in accordance with the conviction, sentenced in accordance with the conviction and confined

sumes that a convicted defendant will be sentenced. The purpose of an examination under § 17-244 is to allow the commissioner of mental health to make recommendations as to certain offenders concerning the sentence to be imposed and the place of confinement. See General Statutes §§ 17-244 and 17-245.[4] That that was the purpose for which the defendant's motion was offered is obvious from the transcript of the hearing on the defendant's motion, which took place on

in the institute for custody, care and treatment, placed on probation by the court or placed on probation by the court with the requirement, as a condition to probation, that he receive outpatient psychiatric treatment."

[4] "[General Statutes] Sec. 17-245. DISPOSITION OF DEFENDANT AFTER REPORT. (a) If the report recommends that the defendant be sentenced in accordance with the conviction, placed on probation by the court or placed on probation by the court with the requirement, as a condition of such probation, that he receive outpatient psychiatric treatment, the defendant shall be returned directly to the court for disposition. If the report recommends sentencing in accordance with the conviction and confinement in the institute for custody, care and treatment, then during the period between the submission of the report and the disposition of the defendant by the court such defendant shall remain at the institute and may receive such custody, care and treatment as is consistent with his medical needs.

"(b) If the report recommends confinement at the institute for custody, care and treatment, the court shall set the matter for a hearing not later than fifteen days after receipt of the report. Any evidence, including the report ordered by the court, regarding the defendant's mental condition may be introduced at the hearing by either party. Any staff member of the diagnostic unit who participated in the examination of the defendant and who signed the report may testify as to the contents of the report. The defendant may waive the court hearing.

"(c) If at such hearing the court finds the defendant is not in need of custody, care and treatment at the institute, it shall sentence him in accordance with the conviction or place him on probation. If the court finds that such person is in need of outpatient psychiatric treatment, it may place him on probation on condition that he receive such treatment. If the court finds such person to be mentally ill and dangerous to himself or others and to require custody, care and treatment at the institute, it shall sentence him in accordance with the conviction and order confinement in the institute for custody, care and treatment provided no court may order such confinement if the report does not recommend confinement at the institute. The defendant shall not be subject to custody, care and treatment under this part beyond the maximum period specified in the sentence."

April 4, 1983. At that time defense counsel argued, "I cannot see any reason why the Court and why the State's Attorney's office and why the probation officer would not at least want the input of as many professionals as is possible for the purpose of determining what an appropriate sentence would be. That is what we are asking."

Section 17-244 (a) allows the trial court in its discretion to order an examination of a convicted defendant by the commissioner of mental health if it appears to the court that such person is "mentally ill *and* dangerous to himself or others." (Emphasis added.) The psychiatric reports submitted as exhibits at the hearing on April 4, 1983, while they indicate that the defendant was suffering from a mental illness and that imprisonment in a conventional prison setting might be detrimental to him, contain nothing to indicate that he was presently a danger to himself or others. The trial court did not abuse its discretion in refusing to order an examination under § 17-244 as requested by the defendant. See *State* v. *Gates,* 198 Conn. 397, 404, 503 A.2d 163 (1986).

The defendant's brief appears to claim, however, that the psychiatric reports submitted in connection with the defendant's motion for a hearing under § 17-244 were sufficient to alert the trial court to the question of the defendant's competence to be sentenced, and the trial court, apparently sua sponte, should have ordered a competency examination. "A defendant shall not be tried, convicted or *sentenced* while he is not competent. For the purposes of this section, a defendant is not competent if he is unable to understand the proceeding against him or to assist in his own defense." (Emphasis added.) General Statutes (Rev. to 1983) § 54-56d (a); *State* v. *Lloyd,* 199 Conn. 359, 364–65, 507 A.2d 992 (1986).

We recognize that the trial court had a constitutional obligation under the due process clause, sua sponte, to hold an evidentiary hearing, and if necessary, to order a competency examination, if there was substantial evidence that the defendant was not competent. *Pate* v. *Robinson,* 383 U.S. 375, 385, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966); *State* v. *Lloyd,* supra, 365; *State* v. *Watson,* 198 Conn. 598, 605, 504 A.2d 497 (1986). A review of the record, however, reveals that prior to sentencing the trial court had the benefit of the psychiatric report submitted in connection with the defendant's court-ordered § 54-56d examination, when he was found competent to stand trial, and also observed him throughout the trial. It also had three psychiatric reports prepared after the defendant's conviction and submitted by the defendant as exhibits at the hearing in connection with his § 17-244 motion. These reports do not indicate that the defendant's mental condition had deteriorated since the date of the court-ordered competency examination or that he was not competent to be sentenced.

On the basis of the record, therefore, the trial court did not have before it such substantial evidence of the alleged lack of competence of the defendant to be sentenced to require it, sua sponte, to undertake an evidentiary inquiry or order a competency examination. The trial court, therefore, did not violate the defendant's right to due process by proceeding with sentencing.

There is no error.

In this opinion the other justices concurred.