I INTRODUCTION
Pursuant to an August 8, 2002 motion, Alex Sostre, the defendant, seeks to suppress written statements he gave to police interrogators. The facts underlying the present case are set out in our Supreme Court's decision in State v. Sostre, 261 Conn. 111, 802 A.2d 754 (2002), and will not be repeated here.
The five claims the defendant makes in his motion are as follows. First, the aforementioned statements were not voluntary, in violation of the defendant's rights to due process of law or; second, the statements were obtained in violation of the rule of Miranda v. Arizona, 384 U.S. 436,86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), *Page 105 
and its progeny; see also State v. Ferrell, 191 Conn. 37, 40-41,463 A.2d 573 (1983); or; third, the statements were obtained in violation of the defendant's right to counsel or; fourth, article first, §§ 8 and 9, of the constitution of Connecticut require the state to prove advisement and waiver of Miranda rights and voluntariness of a defendant's statement beyond a reasonable doubt when such statements are used as evidence of capital felony and the state cannot do so; but see State v. James,237 Conn. 390, 678 A.2d 1338 (1996), and State v. Lapointe, 237 Conn. 694,678 A.2d 942, cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378
[1996]; or; fifth and finally, under article first, §§ 8 and 9, of the constitution of Connecticut, the defendant's physical, emotional and mental state rendered any such statements involuntary as a matter of state constitutional law.
On October 4, 2002, the defense filed a memorandum of law in support of its motion. The state has responded with a memorandum of law in opposition dated October 7, 2002.
Having considered the full record, relevant cases, and the arguments put forth by counsel in court and in their written submissions, the court denies the motion for the reasons subsequently set forth.[1]
 II FINDINGS OF FACT
An evidentiary hearing was held on October 1 and 2, 2002. Witnesses at the hearing were Detective Reinaldo Ortiz, a state police trooper, together with Detectives Luisa St. Pierre and Andrew Weaver of the Hartford *Page 106 
police department and Sergeant Stephen J. Miele, also of the Hartford police department. The court found these witnesses to be credible and reliable. Based on the evidence produced at the hearing, the court finds the following.
On the evening of January 26, 1999, Miele responded to a call. He knew that there was an outstanding warrant for the defendant and that the defendant was a suspect in East Hartford police Officer Brian Aselton's shooting. He believed the warrant related to a domestic violence case. At approximately 1:15 a.m. on January 27, 1999, Miele went to 189-91 and 193-95 Russ Street, which are separate buildings. Approximately twenty uniformed and identifiable police officers were there from three different police departments. He successfully served the warrant on the defendant and took him into custody. He recalled the defendant opening the locked door of the apartment in which he was located and putting his hands to his sides. The defendant was ordered to the ground; he cooperated. The defendant's hands were then handcuffed behind his back. He was patted down for weapons. None were found. Weaver then took the defendant to the major crimes squad — referred to at that time as the crimes against persons division — at the Hartford police station. Miele could not recall precisely when he took the defendant into custody.
On January 26, 1999, Weaver was a uniformed patrol officer. He was sent to 189 Russ Street that evening to attempt to locate the defendant in connection with an outstanding domestic violence warrant. Between 1 p.m. and 1:15 a.m., he successfully took the defendant into custody. Many officers were present at 189 Russ Street to search and secure the building. The defendant was arrested, placed in handcuffs, escorted down a back stairwell and placed into a police cruiser. Two detectives were in the vehicle with the defendant. The warrant was then served on him, and the defendant *Page 107 
cooperated. Thereafter, the defendant was taken to an interview room at the major crimes squad at the Hartford police station. Weaver saw the defendant crying in the interview room.
Ortiz, a state trooper with fifteen years of experience, stated that he had received training in interviewing and interrogating suspects, including advanced interviewing and interrogating. Specifically, he has had training and experience in connection with the giving of Miranda
warnings, which he was taught to give as a standard procedure.
On January 27, 1999, Ortiz was assigned to interview the defendant, also known as Noel Sostre, at the Hartford police department. The interview took place in an interview room upstairs at the Hartford police station. Ortiz arrived there at around 6 a.m. on January 27, and first encountered the defendant in an interview room at about 7:30 a.m. The room had a desk and a couple of chairs. When Ortiz arrived, he was informed that someone was in the room with the defendant. Ortiz knew the defendant was being held on a Hartford arrest warrant. He further knew that the defendant was a suspect in the shooting of Officer Aselton. Upon encountering the defendant, Ortiz, who also speaks Spanish, asked the defendant if he spoke any English. The defendant indicated that he was a lot more comfortable speaking Spanish; consequently, the interview was conducted in Spanish. The defendant indicated no difficulty in communicating with Ortiz and expressed no difficulty in understanding him. During the interview, the defendant's hands were handcuffed in front of him. Ortiz had his uniform and badge on, and was armed.
At the start of the interview, Ortiz advised the defendant of hisMiranda rights by reading the rights to him off the advice of rights form (form) written in Spanish. In court, Ortiz translated the form, which enumerated *Page 108 
the Miranda rights, into English. The defendant signed his initials after each right and signed the form at the bottom following language that summarized the rights he was waiving and recited that he was speaking "freely, without any threat, fear or promises." Ortiz reviewed the form line by line with the defendant and explained his rights to him. He read the waiver language to the defendant. Ortiz observed the defendant take the document into his hands and look at it. The defendant did not ask any questions about the document and said he understood his rights. The defendant wanted to talk. The defendant indicated that he was twenty-three years old. He signed the form at 7:30 a.m.
At the start of the interview, the defendant appeared to be very nervous. As the interview wore on, the defendant talked freely and, sometimes, became quite emotional. At times, he put his head down and became quiet. On the whole, however, concluded Ortiz, the defendant wanted to talk. At no time did the defendant indicate any reservations about talking. When the interview began, Detective Anthony Buglione, who does not speak Spanish, was present. Ortiz requested the presence of another Spanish speaking officer, so Detective St. Pierre, who speaks Spanish, was brought into the room.
The defendant was asked if he was under the influence of alcohol or narcotics. There was no indication he was. He was then asked if he needed anything. He said he did not. Initially, the defendant was asked about his family situation, including his relationship with his wife, where he lived, and where he grew up. In this initial part of the interview, which lasted about fifteen to twenty minutes, the defendant spoke freely and never indicated any difficulty in understanding. Eventually, the discussion turned to the East Hartford incident. Ortiz indicated to the defendant that he was investigating a robbery and Officer Aselton's shooting. The entire interview lasted about four hours. The defendant was *Page 109 
given a soft drink; he never requested food. At about 10 a.m. or 10:15 a.m., he asked if he could see his wife and daughter; that request was granted once the interview was concluded, after twelve o'clock noon.
The defendant gave a statement. He implicated his codefendants as accomplices in the robbery and further implicated one of them as having shot Aselton. St. Pierre took notes during the interview, then used a laptop computer to prepare a written statement (statement). During the interview, the defendant demonstrated some of the events that took place during the robbery and showed his position with regard to the confrontation with Officer Aselton. He never asked to use the lavatory. Both Ortiz and St. Pierre asked questions. The interview proceeded in a question and answer format.
After the statement had been typed on the laptop, it was printed out, shown to the defendant and then read back to him. He was permitted to read the statement, and he signed it in the presence of Ortiz and St. Pierre. He asked no questions about the statement and indicated he had no difficulty in reading it. On the rights form, the defendant indicated both that he attended school through the ninth grade and that he could read Spanish. He further indicated that he cannot write in English but that he can write in Spanish. The defendant neither reviewed nor approved the English translation of the statement prepared by Ortiz.
Ortiz read to the defendant the portion of the statement indicating that the defendant had been advised of his rights and that he had waived them. The defendant had no questions about this portion of the statement.
The defendant never requested any desire to break off questioning during the four hour interview. Neither did the defendant refuse to answer any questions, *Page 110 
express confusion or indicate that he was unable to answer any questions put to him. He was emotional and upset and cried during the interview. During the interview, the defendant asked about the other witnesses and if they were providing information.
After the defendant had signed the written statement, Ortiz stepped out of the interview room and was presented with another document, a waiver form, relating to a notice from the public defender's office. Lieutenant Timothy Barry had instructed Ortiz to present this waiver form to the defendant, which he did. The defendant signed the waiver form at 12:02 p.m. The form indicates, in summary, that the defendant had been advised by Ortiz and St. Pierre that legal counsel was available to consult with him regarding charges he was facing or could face and that he gave up his right to speak to a lawyer. The defendant expressed no reservations about signing this form and signed it in Ortiz' presence. After the defendant signed this waiver form, he was not interviewed further. At the time of the interview, the defendant had not been charged with Aselton's murder. Neither Ortiz nor St. Pierre became aware of the attempt by the office of the public defender (office) to request that any suspect in Officer Aselton's death be informed that the office was available for a consultation with the defendant until after he had finished giving the statement, memorialized by the detectives.
St. Pierre, a detective in the major crimes division for fifteen years, testified. On the evening of January 26, 1999, she went to 189 Russ Street and proceeded to the apartment of the defendant's mother, where she stayed throughout the night. In the morning, she went to the Hartford police department and was told that her assistance was required because she spoke Spanish. She then went to the major crimes interview room. She believes the defendant was offered food. The waiver *Page 111 
of counsel form was given to the defendant after he had been interviewed and had signed the statement. The defendant did not testify at the hearing.
 III CONCLUSIONS OF LAW
The defendant has challenged his written statement in three respects. First, he argues that the statement was not made knowingly and voluntarily. Second, he claims that the statement was obtained in violation of his rights under Miranda v. Arizona, supra, 384 U.S. 436, and its progeny, and State v. Ferrell, supra, 191 Conn. 40-41. Third, and finally, he argues that the statement was made in violation of his right to counsel under State v. Stoddard, 206 Conn. 157, 537 A.2d 446 (1988).
The parties agree, and the record reflects, that the defendant was lawfully in custody when the questioning occurred.
To demonstrate that the defendant knowingly and voluntarily waived his privilege against self-incrimination, the state must show by a preponderance of the evidence that the defendant knowingly and intelligently waived his constitutional right to remain silent. State v.Schroff, 206 Conn. 182, 195, 536 A.2d 952 (1988); State v. Toste,198 Conn. 573, 579-80, 504 A.2d 1036 (1986). The waiver must be made with a full awareness of the nature of the right being abandoned and the consequences of abandoning it. Moran v. Burbine, 475 U.S. 412, 421,106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986). The question is "whether the defendant in fact knowingly and voluntarily waived his rights delineated in the Miranda case"; North Carolina v. Butler, 441 U.S. 369, 373,99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979); and is an issue not of form, but of substance. Whether or not a waiver has occurred must be determined in light of the *Page 112 
facts and circumstances of each case, including "the background, experience and conduct" of the accused. Johnson v. Zerbst, 304 U.S. 458,464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938).
Factors to be considered in determining whether a defendant has "knowingly and intelligently" waived his rights under Miranda are set out in State v. Toste, supra, 198 Conn. 580-81. These factors will now be considered individually.
 A The Defendant's Level of Experience
While there is substantial evidence in the overall record of the case that the defendant has had considerable experience with the criminal justice system, evidence produced at the hearing on the motion to suppress, to which the court is confining itself, indicates very little about his level of experience. One of the defendant's exhibits does indicate that in July, 1998, he was represented by the office of the public defender in at least three cases. There is nothing in the record that indicates that the defendant was confused, did not understand what was occurring, failed to understand the legal rights he waived or failed to appreciate the consequences of the waiver. See State v. Pinder,250 Conn. 385, 425-26, 736 A. 2d 857 (1999).
 B The Defendant's Intelligence
The evidence at the hearing, including the testimony of the witnesses, indicates that the defendant attended school through the ninth grade, speaks and writes Spanish, reads Spanish and English, and does not write in English. There is nothing in the evidence at the hearing on the motion to suppress that suggests that the defendant was lacking in intelligence, suffered from a mental *Page 113 
deficiency or that intellectual limitations influenced his judgment when questioned by Ortiz and St. Pierre. See State v. DeAngelis, 200 Conn. 224,235, 511 A.2d 310 (1986).
 C The Defendant's Age at the Time of the Statement
The evidence indicates that the defendant was twenty-three years of age when the statement was made and, hence, was an adult. See State v. Perez,218 Conn. 714, 591 A.2d 119 (1991) (statement of fourteen year old admissible).
 D The Defendant's Education
As noted previously, the evidence indicates that the defendant attended school through the ninth grade. This educational level does not prevent the court from concluding that his statement was made voluntarily and knowingly. See State v. Toste, supra, 198 Conn. 581 (defendant operating at sixth to seventh grade level).
 E The Defendant's Vocabulary and Ability to Read and Write in the Language in Which the Warnings Were Given
As noted, the evidence indicates that the defendant was able to read and write in Spanish, the language in which the interview was conducted by the two Spanish speaking officers who interrogated him. There is no indication that his decision to talk with the police was influenced by a lack of understanding or comprehension of what was occurring or what was being said. The defendant was given an opportunity to review the statement with his interrogators. *Page 114 
 F The Lack of Any Advice as to His Constitutional Rights
This will be fully discussed subsequently when the court addresses the issues raised by State v. Stoddard, supra, 206 Conn. 157.
 G The Length of Detention
The witnesses were not precise on this point, but the record indicates that the defendant was taken into custody at approximately 1:15 a.m. on the morning of January 27, 1999. He was held overnight without being questioned, and questioning later began at 7:30 a.m., the time at which the defendant signed the advice of rights form. The evidence indicates that the questioning lasted for approximately four to four and one-half hours.
Although he may have been up all night, there is no indication in the evidence that the relatively modest length of overnight detention in any way served to overwhelm the defendant's will or reasoning powers. SeeState v. Hafford, 252 Conn. 274, 299-300, 746 A.2d 150 (defendant awake twenty-seven hours during which he was interrogated eight times), cert. denied, 531 U.S. 855, 121 S. Ct. 136, 148 L. Ed. 2d 89 (2000); State v.DeAngelis, supra, 200 Conn. 235 (almost eleven hours of interrogation); cf. Culombe v. Connecticut, 367 U.S. 568, 81 S. Ct. 1860, 6 L. Ed. 2d 1037
(1961) (five day interrogation).
 H The Repeated and Prolonged Nature of the Questioning
The evidence indicates that during the night the defendant was not being questioned; the questioning *Page 115 
only began at approximately 7:30 a.m. There is no indication that the defendant was subjected to anything like the kind of exhausting or incessant questioning that courts have found troubling. Indeed, the uncontroverted testimony is that the defendant was not only willing to talk, but that he was anxious to learn what other codefendants were saying to police. See State v. Carter, 189 Conn. 631, 637, 458 A.2d 379
(1983).
 I The Use of Physical Punishment, Such as the Deprivation of Food and Sleep
The evidence indicates that there was no bed or cot in the interview room where the defendant spent the night. It appears highly unlikely, under the circumstances, that he got any sleep, and the court will proceed on that assumption. There is nothing in the record, however, from which the court can conclude that the defendant was sleep deprived, sleepy or even tired. Given his emotional state and the circumstances facing him, this is unlikely. None of the witnesses provided testimony suggesting that having been up during the night affected the defendant's ability fully to understand, evaluate or appreciate the consequences of what he was doing. See State v. DeAngelis, supra, 200 Conn. 234
(interrogating officer knew defendant had not slept); State v. Carter, supra, 189 Conn. 638 (while defendant may have been sleepy at end of interview, statement found to be voluntary nonetheless). He was handcuffed, but there is no indication that this interfered with his ability freely to make decisions or had a coercive effect. The evidence, including the defendant's interest in what his codefendants were saying, his desire to see his family and his heightened emotional state all militate against any claim that tiredness overwhelmed his ability knowingly, voluntarily and intelligently to waive his rights. *Page 116 
There is no evidence that the defendant was hungry. He was given a soft drink. St. Pierre testified that to the best of her recollection, the defendant was offered food. See State v. Stevenson, 70 Conn. App. 29,797 A.2d 1 (2002). He was also offered the use of a restroom.
It is not alleged that the defendant was, in any way whatsoever, physically abused or punished while being interrogated, nor is there any evidence in that regard. The evidence indicates that the defendant was treated professionally and courteously at all times. As previously mentioned, his request to see his wife and child was honored, following the end of the interrogation, shortly after noon.
 J The Defendant's General Physical, Mental and Emotional State
There is evidence that the defendant was upset and cried. As the state has noted, it is perfectly understandable that he would be upset under the circumstances. His display of emotion, however, in no way suggests that the defendant's mental or emotional state interfered with his ability knowingly, intelligently and voluntarily to assess his situation and understand and waive his legal rights. To the contrary, the evidence establishes that the defendant was in full possession of his faculties when he decided to talk. Nothing in the record indicates that the defendant was suffering from any physical or psychological limitation, condition or injury that could have adversely affected him. Nor is there anything in the record to suggest that he was under the influence of drugs, alcohol or medications that could have interfered with his reasoning or decision-making powers. *Page 117 
 IV STODDARD ISSUE
In reliance on State v. Stoddard, supra, 206 Conn. 157, the defendant argues that his statements were taken in violation of his right to counsel and therefore ought to be suppressed.[2]
During the evidentiary hearing, over the state's objection, the court admitted defense exhibits A and B as full exhibits. Defense exhibit A is a letter, dated January 25, 1999, signed by senior assistant public defender Ronald Gold of the capital defense and trial services unit of the office of the chief public defender. It is addressed to: "Commanding Officer, State Police, Major Crimes Unit, Central District Headquarters, 294 Colony Street, Meriden, Connecticut 06451." Defense exhibit B is an identical letter addressed to police chief James Shay of the East Hartford police department. Documents accompanying the exhibits indicate they were faxed to the intended recipients at 10:59 a.m. on January 25, 1999. The letters state in pertinent part:
"Dear Commanding Officer:
"The Capital Defense and Trial Services Unit of the Office of the Chief Public Defender has become aware of your Department's investigation into the death of East Hartford Police Officer Brian Aselton on January 23, 1999, as reported in the media on Sunday and the Hartford Courant today. *Page 118 
"In the event that any suspect is taken into custody in connection with this investigation, I formally request that such suspect be informed, in accordance with State v. Stoddard, [supra, 206 Conn. 157], that an attorney from the Office of the Public Defender is available to consult with him or her for the purpose of providing legal assistance before or during questioning. Notification should be given to the suspect prior to any interrogation by members of your department or by other agents of the State of Connecticut, unless, of course, the suspect has expressed a desire for private counsel.
"In the event that an individual accepts this offer of legal assistance, please contact me at this office. . . . An attorney from the Division of Public Defender Services will respond as soon as possible for the initial purpose of insuring that the individual meets the financial guidelines for our services, and, if he or she does, for any appropriate, requested consultation.
"The Stoddard case states that `a suspect must be informed promptly of timely efforts by counsel to render pertinent legal assistance; This duty on the part of the police departments to inform suspects exists regardless of whether or not a prior attorney-client relationship exists. . . ."
The court agrees with the state that the defendant's Stoddard argument must fail and that as broad as the holding in Stoddard may be, it does not encompass the facts in the present case.
General Statutes § 51-296, entitled "Designation of public defender for indigent defendant, codefendant," provides guidance. Section 51-296
provides in relevant part: "(a) In any criminal action . . . the court before which the matter is pending shall, if it determines after investigation by the public defender or his office that a defendant is indigent as defined under this chapter, designate a public defender, assistant public defender *Page 119 
or deputy assistant public defender to represent such indigent defendant. . . . (c) Prior to a defendant's appearance in court in any matter specified in subsection (a) of this section, a public defender, assistant public defender or deputy assistant public defender, upon a determination that the defendant is indigent pursuant to subsection (a) of section 51-297, shall be authorized to represent the defendant until the court appoints counsel for such defendant." General Statutes § 51-296.
As a threshold matter, § 51-296, viewed through the lens of Stoddard, requires that two things occur before the court can appoint a public defender to represent a defendant: first, a "criminal action" must be "pending" before a court; and second, a determination of indigency must be made.
In the present case, while Officer Aselton's murder was being investigated at the time defense exhibits A and B were being sent, the case was not yet pending in court. The defendant had not yet been taken into custody, no determination of indigency had been made and the defendant had not consented to be represented by the office of the public defender. Defense exhibits A and B, therefore, were faxed in anticipation of the possibility that an actual suspect would be taken into custody, that a case would be brought in court, that a finding of indigency would be made and that the defendant would consent to be represented by the office. While some of these contingencies were predictable, and some indeed did eventuate, they had not yet happened at the time defense exhibits A and B were faxed. At the time the faxes were sent, no known suspect was in police custody.
As expansive as the court's ruling was in Stoddard, the defense argument overestimates its reach. Notwithstanding the sweeping dicta inStoddard, this court does *Page 120 
not believe it authorizes the kind of anticipatory letters that were sent out in the present case before a known suspect has even been taken into custody. Stoddard is distinguishable on its facts, and its holding must be viewed in light of those facts.[3]
In Stoddard, the defendant called detectives after learning that they wanted to question him in connection with a murder investigation. The defendant refused to be questioned at the police station, but discussed the case on the telephone. Later, he gave a written statement. He was arrested by police, informed of his Miranda rights and taken to the police station. After again being informed of his Miranda rights, he was taken to a room for interrogation.
Within fifteen minutes of the arrest, the defendant's girlfriend tried to reach William Fitzpatrick III, an attorney who had represented the defendant in the past. Subsequently, on four separate occasions, John Fitzpatrick, a partner of William Fitzpatrick, called the police station in an attempt to talk to the defendant. He was told that the defendant was not in the custody of the Bridgeport police. The defendant did not know a lawyer was attempting to contact him, nor did the interrogating officers have knowledge of the efforts of counsel.
In an opinion by Chief Justice Ellen Peters, in reliance on the constitution of Connecticut, and contrary to cases under federal law; see, e.g., Moran v. Burbine, supra, 475 U.S. 428; the court ruled that "a suspect must be informed promptly of timely efforts by counsel to render pertinent legal assistance." State v. Stoddard, supra, 206 Conn. 166. The court stated that "lack of *Page 121 
knowledge on the part of the interrogating officers is not dispositive because it is for the police, as an entity, to establish and maintain adequate procedures that will facilitate the reasonably prompt communication between an attorney and a [client]." Id., 172. The court added that "the prior existence of an attorney-client relationship is not relevant" to the duty of the police to inform a suspect that counsel is available. Id. The court went on to consider under what circumstances statements obtained in violation of the duty of the police must be suppressed. Rejecting what it characterized as the majority rule that "a lack of knowledge always fatally undermines the [client's] continuing right to claim the presence of counsel"; id., 174; the majority adopted a "totality of the circumstances" test, placing the burden of proof on the state by a preponderance of the evidence. Id., 176. "The critical question is whether the information not conveyed by the police would likely have changed the defendant's appraisal and understanding of the circumstances." Id., 175. "Of particular, but not exclusive relevance," continued Chief Justice Peters, are "such facts and circumstances as the relationship of the suspect to the attorney, the nature of counsel's request, the extent to which the police had reasonable notice of counsel's request and the conduct of the suspect." Id.
In the present case, the court agrees with the state's argument that while the result in Stoddard is understandable given the facts of that particular case, the Stoddard principle was not properly and timely triggered because there was no timely request to consult with a known suspect. In Stoddard, the defendant was formally placed under arrest when interrogated; in the present case, the defendant was taken into custody on an unrelated warrant. In Stoddard, the defendant initiated the conduct with preexisting counsel through *Page 122 
his girlfriend in the present case, the contact was initiated, unsolicited, by the office of the public defender. In Stoddard, the repeated requests by counsel to contact his client were initiated after the defendant was in custody, in response to his request for legal assistance; here, defense exhibits A and B were faxed anticipatorily, prior to anyone — including the defendant — being taken into custody. Further, in Stoddard, the court clearly concluded that the police authorities deliberately interfered with counsel's attempt to contact an existing known client who had reached out for legal assistance. WhileStoddard is explicitly not premised on a finding of police misconduct, there is no indication in the record in the present case of any deliberate misconduct. To the contrary, the record indicates that as soon as the officers conducting the interview became aware that the office wanted to consult with any suspect taken into custody, they informed the defendant of this. St. Pierre stated that although they wanted to ask the defendant more questions, they stopped questioning him at this point.
Our Supreme Court's decision in Gipson v. Commissioner of Correction,257 Conn. 632, 640, 778 A.2d 121 (2001), relied on by the defendant, does not alter the court's view. In that case, by its very terms, at issue was a "`criminal action'" already pending in court, as to which certification was being sought. Other cases relied on by the defendant do not change the court's view, either. See, e.g., People v. McCauley, 163 Ill. 2d 414,645 N.E.2d 923 (1994) (attorney retained by family refused opportunity to consult with defendant in custody at police station); State v. Reed,133 N.J. 237, 627 A.2d 630 (1993) (police refused to permit attorney retained by family to consult with defendant already in custody at police headquarters). In most of the cases *Page 123 
relied on by the defendant, a known suspect was already in custody and was denied permission to consult with an attorney retained by someone with a connection to the defendant, such as the defendant's family.
The court concludes that in the present case there was no timely request of counsel to consult with a known suspect.
Even if the present case did come within the broad ambit of Stoddard, consideration of the full record, including the defendant's decision knowingly, intelligently and voluntarily to waive his Miranda rights and talk freely with the police, leads the court to conclude that by a preponderance of the evidence, the state has met its burden of demonstrating that the defendant would not likely have acted differently if he had received from the police information about defense exhibits A and B. There is no indication that he was being represented by the public defender's office in connection with the domestic matter for which he was arrested on an outstanding warrant. He had been represented by the public defender's office in July, 1998, however, and was thus familiar with the existence of its services. Counsel's request, as contained in defense exhibits A and B, was necessarily tentative because the defendant had not been evaluated for indigency and because he had not requested that the public defender represent him. There is nothing in the record to suggest that police authorities intentionally delayed conveying the information to the defendant. Ortiz testified that as soon as he became aware of the letter, he conveyed information to the defendant about it. Moreover, after conveying that information to the defendant, the defendant signed the aforementioned waiver of counsel form, indicating that he understood he had a right to legal representation at all times while being questioned, but that he was waiving that right. After he signed this form, no further questioning occurred. The decision to speak *Page 124 
or stand mute, as was emphasized in Stoddard, cannot be delegated to counsel. It is "a personal right of the suspect" that belongs "exclusively to him." State v. Stoddard, supra, 206 Conn. 174; see alsoState v. Cobb, 251 Conn. 285, 360-64, 743 A.2d 1 (1999), cert. denied,531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000). The defendant signed the waiver of counsel form after he had already waived his right to have counsel present and had given a statement to police. Moreover, while on earlier occasions he had been represented by the public defender's office, there is nothing in the record demonstrating that he knew who the aforementioned attorney Gold was. The full record leads the court to conclude that the state has met its burden.
 V PRETEXT ARGUMENT
The defendant was taken into custody on an unrelated Hartford warrant and then questioned about his involvement in Aselton's murder. The defendant argues, citing various cases, that arresting him on the outstanding warrant was a "pretext" to obtain his statement on capital felony charges. This argument is not persuasive.
There is nothing in the record to indicate that the arrest of the defendant was "pretextual." Police authorities lawfully arrested the defendant on a valid, outstanding warrant. At the time of the arrest, police had information leading them to suspect that the defendant had committed the murder of a police officer. Arresting the defendant on an outstanding warrant amounted to the use of a common investigative technique to take into custody someone wanted for questioning, but that does not make it pretextual. State v. Falby, 187 Conn. 6, 444 A.2d 213
(1982). *Page 125 
The record does not indicate that Ortiz or St. Pierre tricked, misled or lulled the defendant in any way, particularly given the presence of numerous officers when he was taken into custody at 189 Russ Street, and the circumstances surrounding his arrest and conveyance to the Hartford police station. The defendant surely must have understood that the police wanted to talk to him about something other than his outstanding domestic case. The uncontroverted testimony of these two witnesses, which the court credits, was that the defendant talked freely and openly with them. The testimony was that the interrogating officers first discussed family matters with the defendant and then segued into a discussion of the murder. The evidence is that rather than being misled, the defendant was anxious to obtain from the officers information about what other of his codefendants were saying about the robbery and murder. It is chimerical, given all the circumstances, to argue that the defendant did not fully understand that the police wanted to discuss Officer Aselton's murder. See Colorado v. Spring, 479 U.S. 564, 107 S. Ct. 851,93 L. Ed. 2d 954 (1987); Michigan v. Mosley, 423 U.S. 96, 104-105,96 S. Ct. 321, 46 L. Ed. 2d 313 (1975). Under the circumstances, most particularly including the defendant's interest in learning from the officers what he could about the investigation, it is clear that the defendant understood himself to be a prime suspect in the murder. SeeState v. Falby, supra, 187 Conn. 16. There is nothing in the record to suggest that police authorities "intentionally misled" the defendant as to the purpose of the interrogation. See State v. Boscarino, 204 Conn. 714,745, 529 A.2d 1260 (1987).
 VI CONCLUSION
In State v. Pinder, supra, 250 Conn. 418-19, our Supreme Court discussed the test to be used in evaluation *Page 126 
the admissibility of a confession. The court noted: "We have stated that the test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined. . . . The ultimate test remains . . . Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been over-borne and his capacity for self-determination critically impaired, the use of his confession offends due process." (Citations omitted; internal quotation marks omited.) Id.
Considering the totality of the circumstances, there is no evidence that the defendant's decision to waive his rights and talk to his interrogators was anything other than the result of his free, considered and unconstrained choice. There is nothing in the record from which the court could conclude that the defendant acted under duress or that the defendant's will to resist was overborne in any way, physically or psychologically. There is no evidence in the record indicating a lack of understanding by the defendant of what he was doing or the legal consequences of his actions. At no time did the defendant indicate a desire to speak to a lawyer or a desire to terminate the interview. There is nothing in the record to suggest that his waiver was the result of trickery, coercion or lack of comprehension. At no time did the defendant ask for clarification or explanation of what was occurring. There is nothing in the record to suggest that his statement was the result of threats or physical or emotional coercion, lack of sleep or lack of food. The court is unaware of any legal support for the proposition, urged by the defendant, that he did not understand the "consequences" of his conduct because he was not specifically informed that *Page 127 
any statement he made could be used by the state to seek the death penalty.
For the reasons previously stated, the court concludes that theStoddard principle does not apply and that even if it did, the state has met its burden of demonstrating that the defendant's appraisal and understanding of the circumstances would not likely have changed even if he had been aware of the information contained in defense exhibits A and B.
 The state has met its burden of demonstrating that the defendant understood his rights and waived them knowingly, intelligently and voluntarily when he submitted to interrogation and gave a statement to police.
Consequently, the defendant's motion to suppress statements, dated August 8, 2002, is denied.