[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION 
These are coterminous petitions seeking an adjudication of neglect as to one child and a termination of parental rights to both of respondents' children. The respondent father has consented to the termination of his parental rights. The respondent mother has not. The dispositive issue is whether the mother assaulted her three month old baby, Michael, through a deliberate, nonaccidental act that resulted in his sustaining serious bodily injury.
On September 15, 1998, the Department of Children and Families (DCF) filed coterminous petitions alleging that the respondent and her husband (the father), had neglected their two baby sons, Clark and Michael. Specifically, DCF alleged that while in the care of the respondent, Michael sustained a subdural hematoma, fractured skull, and social deprivation. The petition alleged that the children had "been denied, by reason of an act or acts of parental commission or omission including, but not limited to . . . severe physical abuse or a pattern of abuse, the care, guidance or control necessary for his/her [sic] physical, educational, moral or emotional well-being." On July 20, 2000, DCF was permitted to amend its petitions to delete the grounds alleged as to the father and allege instead that he consented to the petition. On November 20, 2000, the first day of trial, DCF was permitted to further amend its petitions to allege in the neglect petition, that "Michael has been abused and has physical injuries inflicted by other than accidental means in that his CT scan of the abdomen and pelvis on September 11, 1998 revealed a lesion with decreased attenuation in the spleen, consistent with a hematoma." DCF was permitted to amend its termination petition to allege that "Michael has been denied by reason of act or acts of commission or omission, including but not limited to . . . severe physical abuse of a pattern of abuse by the mother the care guidance or control necessary for his physical educational, moral or emotional well-being in that his CT scan of abdomen and pelvis on September 11, 1998 revealed a lesion with CT Page 346 decreased attenuation in the spleen, consistent with a hematoma."
The court finds the following facts based on the direct evidence and reasonable and logical inferences drawn therefrom. The respondent and the father are now both twenty-three years of age. Both are high school graduates. Since the age of seventeen years, the respondent has suffered a seizure disorder. The respondents were married in January, 1997. The marriage was not a happy one. Both spouses were immature. Physical and verbal abuse plagued their union.
On July 18, 1997, the respondent gave birth to Clark. Less than eleven months later, on June 10, 1998, she gave birth to Michael. The father worked; the respondent stayed at home and was the children's caretaker. On June 21, 1998, eleven days after Michael's birth, he suffered a 1.5 centimeter laceration on his forehead for which his mother brought him to Waterbury Hospital. The respondent reported that she had suffered a seizure while holding Michael, and that he had fallen and struck the edge of a couch. Both mother and son were treated at the hospital. Michael's wound was closed with steri-strips. The respondent was given a prescription for Dilantin, an anti-convulsant medication, and was told by the emergency room physician to sit when holding her children and not to operate a motor vehicle.
After Michael's birth, the respondent wanted to be permanently sterilized. (Respondent's exhibit ee) On July 24, 1998, she underwent a laparoscopic tubal fulguration.
Michael's pediatrician, Dr. Shaban, examined him during three office visits, on June 25, 1998, July 7, 1998 and August 25, 1998. Shaban observed no evidence of neglect or abuse. Specifically, he observed no evidence of abnormalities in the abdomen, no fixed gaze and no flattening of the skull.
On September 11, 1998, the respondent brutally assaulted Michael. On that date, Michael had been very irritable for about two days. As a result, the respondent also became irritable. At about 11:00 A.M., Ronald Cortigiano, who occupied the apartment above the respondents, heard "three loud thumps" on the respondents' bedroom floor. Each successive thump was seconds apart and each was louder than the previous one. About five minutes later, Cortigiano's doorbell rang three times. When he answered the door, however, no one was there.
Also, at about this time, another neighbor, Christina Vaccaro, heard a knock on her door. She found the respondent crying at her door. According to Vaccaro, Michael was in the respondent's arms and "was shaking all over and his skin color was turning purple and his eyes were rolling back CT Page 347 in his head." Vacarro's fiance's brother telephoned 911 The respondent stated that she had dropped Michael, who had hit his head, but that she did not know what happened because she had blacked out. When asked where her other son Clark, was, she stated that he was in the apartment. Vaccaro then went to find Clark. She located him kneeling in a closet in the respondent's bedroom. When Vaccarro told the respondent where she had found Clark the respondent began to giggle.
An ambulance and police officers responded sometime after 11:00 A.M. Michael's eyes were deviated to the right. The respondent told Officer David Cruz of the Waterbury Police Department that she suffered from seizures for which she took Dilantin. She said that she had picked up Michael from his crib and was changing him when she had a seizure and blacked out. When she regained consciousness, she claimed, she was on the floor, Michael had a bump on his head and was crying.
Michael was taken to Waterbury Hospital by hospital. EMS personnel observed that he was subdued and had left side tremors. At the hospital, the respondent was questioned by Detective John P. Kennelly of the Waterbury Police Department. She told him that she had dropped the baby when she blacked out. She admitted to Detective Kennelly that she did not take Dilantin. Kennelly observed that Michael's gaze was fixed and that he was quiet. He further noted that Michael did not move his eyes, that he had a small scar over his right eye and markings over his right ankle.
At the hospital, a CT scan[1] of the head revealed that Michael had suffered three skull fractures: left parietal, right parietal and right temporo-parietal. A piece of bone had been sheared off the right side of the skull. There was a subdural hematoma caused by blood having collected on the left side of the brain and there was significant soft tissue swelling in the area of the right and left parietal skull fractures. Michael was suffering meningitis and anemia. A CT scan of the abdomen revealed increased density in the upper part of the spleen, evidencing a contusion of the spleen and hematoma. For several days Michael maintained a fixed gaze to the right. The occiptal area of the skull was flattened. Hospital staff observed that Michael had poor hygiene. He was unbathed, dirty, and had long fingernails. Hospital records reflect that he was both irritable and lethargic.
According to Dr. Leonard Zalneraitisnd of Connecticut Children's Medical Center (CCMC) the release of iron from the blood that had collected around Michael's brain caused him to have meningitis. This blood had been around his brain for seven to fourteen days. This collection of blood caused neurologic symptoms including crankiness. In Dr. Zalneraitisnd's opinion, Michael had three skull fractures. The CT Page 348 location of these fractures evidenced that they were caused by at least two traumas. Because of Michael's age, the date these injuries were incurred could not be determined from x-rays.
In a written statement, the respondent gave the police differing versions of how Michael may have been injured on September 11, 1998. First she stated that she had taken her husband to work. Her two sons were in rear car seats. On returning home, she stated: "I was in the process of taking Michael out of the car and he fell out of the car seat and landed on his back." She felt chat Michael might have hit his head. She brought him into the house and eventually laid him down for a nap.
The second version occurred two hours later when, she stated, Michael awoke. The respondent claimed she sat Michael on her lap while she was sitting on the floor. She claimed:
 He seemed like he wanted to burp so I was burping him. He lunged backwards and Michael struck his head on a rocking horse that was near us. He was still being a little fussy and I had his [sic][2] I picked up Michael and stood up with him on my left shoulder holding his bottle I [sic] my left hand. Michael again lunged backward and I dropped him again. He hit the rocking horse again when I dropped him. This time he was not moving and his eyes were shut. He was not crying and I picked him up and he appeared to be dead weight. I moved the rocking horse aou [sic] of the way and wrapped Michael in a blue and white blanket. I shook him a little to awaken him. I also tapped his cheeks and tried to open his eyes. I went upstairs to the neighbors house. . . .At the hospital I told the police that I dropped Michael because I had a seizure. I did have a seizure about 3 months ago when Michael was about 2 weeks old. At that time I was given a bottle of Dilantin pills to take. I was told to get a referral to see a neurologist for seizure treatment but I have not done that as of this time. I did not like the feeling I got when I took the pills for the seizures so I did not take them. I have not taken the pills since 2 days after I got them, 2 days after Father's day. I originally told the police that I have been taking my medication as it was prescribed. I have now admit [sic] that I have not been taking the medication and that Michael had fallen three times today.
CT Page 349 The respondent's statement was taken by Detectives Ariola and Detective Kennely. After the statement was tanscribed, Detective Ariola asked Captain Kathleen Wilson to read it off of the computer monitor. She did so and turned to the respondent, telling her that the injury to Michael did not occur as she claimed and that the respondent knew it. The respondent dropped her head and started to cry. The respondent stated that she could no longer speak with male officers to whom she had "lied," and asked to speak Wilson alone.
The respondent explained to Wilson that her husband worked all the time and did not help with the children, that Michael had not been sleeping well, that she became frustrated and slammed his head against the floor, injuring him. The following is the transcribed statement the respondent gave to Wilson and which she signed.
 This morning I took Michael, my baby, out of his crib. He was screaming, I don't know why. He's only sleeping for a half an hour. He hasn't been sleeping for the past two days. I don't know why. I've just been letting him stay in his crib. When I took Michael out of his crib this morning I put him on the floor and changed his diaper. He still was crying. I held his head on his forehead and pushed his head against the floor one time, and his head slammed against the floor and made a noise as if I dropped a phone book. I didn't think that I slammed him that hard. He was still whimpering so I went outside to calm down. When I came back inside Michael was half asleep. His eyes were half closed. I picked him up to put him in his crib and his head was rolling from side to side. He was breathing in short fast breaths, as if he was grasping for breath. I took Michael and ran to my neighbor's apartment for help. The rest of my statement which I gave . . . is the truth. I don't know how Michael got the mark on his leg. One more thing I want to add is that I was burping Michael and I had him sitting up on the floor. Because he was still crying that's when I put my hand against his forehead and slammed Michael back against the floor. He had been in a sitting up position on the floor when I did the this.
The respondent was arrested on September 11, 1998 and charged with assault in the first degree and risk of injury to a minor. On September 14, 1998, the court ordered that she be released on the posting of an appearance bond in the amount of $110,000 and on the condition that she have no contact with either of her children. The respondent did not object to or otherwise challenge this condition and was released. The charges against her remain pending.[3] The respondent has not seen either of her children since September 11, 1998.
On September 15, 1998, DCF obtained an order of temporary custody with respect to both children. The same day, DCF filed a petition to have CT Page 350 Michael committed as a neglected child and petitions to have the respondents' parental rights terminated with respect to both children. The filing of both neglect and termination petitions is authorized by General Statutes § 17a-12(e).[4] The procedure to be followed when both such petitions are tiled is prescribed by Practice Book §33-12, which provides in relevant: "When coterminous petitions are filed, the judicial authority first determines whether the child is neglected . . . by a fair preponderance of the evidence; if so, then the judicial authority determines whether statutory grounds exist to terminate parental rights by clear and convincing evidence; if so, then the judicial authority determines whether termination is in the best interest of the child by clear and convincing evidence."
 I A. 
Before turning to the merits of the neglect petition, the court addresses two claims advanced by the respondent during trial and in oral argument. These claims pertain to the respondent's refusal to testify and to the statement she gave to Captain Wilson.
First, the respondent claims that she could not testify at trial because of the pendency of the criminal prosecution against her arising out of the underlying incident.
The Fifth Amendment to the United States Constitution protects a criminal defendant against self-incrimination, and that command is made applicable to the individual states through the Fourteenth Amendment.Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); State v. Cohane, 193 Conn. 474, 482, 479 A.2d 763, cert. denied, 469 U.S. 90,105 S.Ct. 397, 83 L.Ed.2d 331 (1984) see also Conn. Constit. Articlefirst § 8. "The fifth amendment privilege against self-incrimination not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." Olin Corporation v.Castells, 180 Conn. 49, 53-54, 428 A.2d 319 (1980).
Practice Book § 34-1 requires the court to advise parents in all juvenile proceedings of their right to silence. Practice Book §34-1(f) further provides: "No parent who is the subject of a petition shall be compelled to testify if the testimony might tend to incriminate in any criminal proceeding or to establish the validity of the facts alleged in the petition." CT Page 351
The privilege against self-incrimination, however, is not a muzzle but a privilege. A defendant "may, of course, intelligently and knowingly waive his privilege against self-incrimination . . either at a pretrial stage or at the trial." Escobedo v. Illinois, 378 U.S. 478, 490 n. 14 (1964). Whether or not to waive the privilege imports free choice. Statev. Madera, 210 Conn. 22, 48, 554 A.2d 263 (1989); State v. Jones,205 Conn. 638, 655, 534 A.2d 1199 (1987). The respondent, therefore cannot complain that she was "unable" to testify at trial when that was her choice.
Second, the respondent has argued that the inculpatory statement she gave to Captain Wilson was not voluntary. Connecticut has long recognized as a matter of fundamental fairness in our law of evidence, let alone our constitutional law, that confessions, or statements against penal interest, must be voluntary. See State v. Willis, 71 Conn. 293, 306-307,41 A. 820 (1898). "The ultimate test of the admissibility of such statements is their voluntariness." State v. DeAngelis, 200 Conn. 224,232, 511 A.2d 310 (1986). Although there is some evidence that the respondent had been questioned by ocher officers for hours before she made her confession to Captain Wilson, the fact is that she sought out Wilson. Moreover, "[t]he mere fact that admissions are made by an accused after a long period of interrogation by a police officer does not necessarily mean those admissions are involuntary." Id., 235.
Wilson testified without contradiction, that she did not threaten the respondent, did not make any promises to her, and did not handcuff her when she was with her. Wilson did offer the respondent food or water during this time.
The court finds chat the respondent's inculpatory statement to Wilson was voluntary and trustworthy.[5]
 B. 
DCF alleges that Michael has been neglected. General Statutes §46b-120 (8) provides that "a child or youth may be found `neglected' who . . . is being denied proper care and attention, physically . . . emotionally . . . or . . . has been abused. . . ." General Statutes § 46b-120 (3) states that "`abused' means that a child or youth (A) has had physical injury or injuries inflicted upon him other than by accidental means, or (B) has injuries which are at variance with the history given of them, or (C) is in a condition which is the result of maltreatment such as, but not limited to, malnutrition, sexual molestation or exploitation, deprivation of necessities, emotional maltreatment or cruel punishment. . . ." CT Page 352
The court finds that the respondent intentionally assaulted Michael in the manner described in her statement to Captain Wilson. This finding is based not only on the respondent's admission, but on the bio-mechanical mechanism of the injury Michael suffered, as explained by Dr. Betty Spivack.
Dr. Spivack is board certified in pediatrics and has a sub-board certification in critical care. She also is a board certified medical examiner. She has had a fellowship in pediatric critical care at Children's Hospital in Buffalo and a fellowship in child abuse and neglect at Hasbro Children's Hospital in Rhode Island. At the time of trial she was about to assume the office of pediatric forensic consultant for the state of Kentucky. She has published in the area of bio-mechanics of abusive childhood injury. Her extensive curriculum vitae was entered into evidence. (Ex. 1)
As Dr. Spivack explained, when Michael presented to Waterbury Hospital on September 11, 1998, he had sustained three skull fractures and a subdural hematoma. The skull fractures were a right parietal skull fracture, a left parietal skull fracture, and a left-sided temporal skull fracture. The left parietal skull fracture was very recent, as was the subdural hematoma. Such a skull fracture could not have been incurred as a result of merely being dropped from a sitting position. It required the application of force, such as could be exerted by a person of adolescence or older.
Dr. Eric Hyson of the radiology department of Waterbury Hospital was uncertain as to whether the x-rays of Michael's head revealed fractures or normal infant markings (sutures). He opined that they "are probably sutures rather than fractures." (Ex. A)
Dr. R. Timothy Brown, who read Michael's CT scan and skeletal survey of the head at CCMC, and Dr. Philip V. Scribano, Michael's attending physician opined that Michael had suffered multiple skull fractures. Dr. Scribano also testified that when Michael was first brought to CCMC, he had a fixed gaze to the right and a flat affect, evidencing emotional neglect or social deprivation. Michael was found to have poor hygiene. He was unbathed, dirty and had long fingernails. The occipital area of Michael's head was flattened, indicating that he had been left lying around for a protracted period of time. These conditions, however, were reversible and, an fact, were subsequently reversed.
The respondent retained Dr. James Merikangas of Woodbridge, a specialist in neurology and psychiatry. Dr. Merikangas met with the respondent twice and performed a review of the records in this case. In CT Page 353 his opinion, Michael most likely suffered injuries to his head and bleeding inside his skull by being dropped by the respondent during an epileptic seizure. The court finds otherwise, and does not credit Dr. Merikangas' opinion for several reasons. "The trial court [is] free to judge the credibility of the expert witnesses." In re Kezia M., App. 12, 23, 632 A.2d 1122 (1993).
First, Dr. Merikangas did not adequately disclose the basis of this opinion to the court. It was, essentially, sheer opinion. In part, the opinion appeared to be based on his crediting a version of events imparted to him by the respondent. The court did not have the benefit of that version, under oath, nor of cross-examination of the respondent. Without such testimony, the court is unable to ascertain the soundness of Merikangas' opinion. Second, Dr. Merikangas' opinion is contrary to the respondent's own statement given against her penal interest. Third, the theory advanced by Dr. Merikangas does not adequately explain how Michael sustained skull fractures and a shearing off of part of the skull. As Dr. Spivack explained, it was extremely unlikely that an infant of three months could have sustained a skull fracture in the manner the respondent described.[6] Thus, an assault is more consistent with Michael's injuries. Fourth, Dr. Merikangas' credibility was impaired by the fact that, as he admitted, he has been retained primarily by defendants in hundreds of cases.[7]
The court also finds that Michael sustained an injury to his spleen chat was a result of abuse. Although Dr. Shaban did not note such an injury when he examined Michael on August 25, 1998, such an injury could have been visited on Michael in the ensuing two weeks. The physicians at Waterbury Hospital confirmed that such an injury existed. Dr. Spivack testified that the injury to the spleen was caused by a blunt trauma which, in the absence of a motor vehicle collision, was the result of abuse.
The court finds that Michael was neglected by being abused in that he has had physical and emotional injuries inflicted upon him other than by accidental means and in that he was "in a condition which is the result of maltreatment. . . ." General Statutes §§ 46b-120(3), (8).
 II A. 
Having found Michael to be neglected, the court turns to whether the respondent's parental rights should be terminated. Practice Book §33-12. "Our statutes define the termination of parental rights as the complete severance by court order of the legal relationship, with all its CT Page 354 rights and responsibilities, between the child and his parent . . . .It is a most serious and sensitive realm of judicial action. . . .To justify the termination of parental rights in the absence of consent, one or more of the grounds set forth in General Statutes § [17a-112 (c)(3)] must be proven by clear and convincing evidence. . . .
"Section [17a-112 (c)(3)] carefully sets out . . . [the] situations that, in the judgment of the legislature, constitute countervailing interests sufficiently powerful to justify the termination of parental rights in the absence of consent. [The commissioner], in petitioning to terminate those rights, must allege and prove, by clear and convincing evidence, one or more of the statutory grounds. In contrast to custody proceedings, in which the best interests of the child are always the paramount consideration and, in fact, usually dictate the outcome, in termination proceedings the statutory criteria must be met before termination can be accomplished and adoption proceedings can begin. No all-encompassing best interests standard vitiates the requirement of compliance with the statutory criteria. . . ." (Internal quotation marks omitted.) In re Antonio M., 56 Conn. App. 534, . 538, 744 A.2d 915
(2000).
"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . .In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child. . . ." (Internal quotation marks omitted.) In reJohn G., 56 Conn. App. 12. 17, 740 A.2d 496 (1999).
 B. 
DCF alleges that the respondent's parental rights should be terminated with respect to Michael pursuant to General Statutes § 17a-112(c)(C) which provides: "the child has been denied, by reason of an act or acts of parental commission or omission including, but not limited to . . . severe physical abuse or a pattern of abuse, the care, guidance or control necessary for his physical . . . or emotional well-being. Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights. . . ." (Emphasis added.) "The phrase prima facie evidence means evidence which, if credited, is sufficient to establish the fact or facts which it is adduced to prove." (Internal quotation marks omitted.) In reCheyenne A., 59 Conn. App. 151, 158, ___ A.2d ___ (2000). CT Page 355
The court finds by clear and convincing evidence that the respondent deliberately and "nonaccidentally" slammed Michael's head against the floor on September 11, 1998. An accident is an unexpected happening.Tiedemann v. Nationwide Mutual Fire Ins. Co., 164 Conn. 439, 445,324 A.2d 263 (1973). The respondent did not accidentally drop Michael on September 11, 1998. She was aware of the consequences of slamming her son's head against the floor. The injury she delivered to her son was a natural and probable result of her action and foreseeable by her as it would be by any reasonably prudent person in her position.
Moreover, that injury was a "serious physical injury." Michael suffered a fracture to the left side of his skull. As Dr. Spivack testified, this resulted in impaired brain functioning, clinical seizures, deviation of the eyes and the potential for permanent brain injury or death. The court finds, therefore, that the respondent inflicted nonaccidental serious physical injury on her son. See In re Theresa S., 196 Conn. 18, 19-20,491 A.2d 355 (1985) (severing arteries with knife serious physical injury); cf. State v. Aponte, 50 Conn. App. 114, 718 A.2d 36 (1998), affirmed in part, reversed on other grounds, 249 Conn. 735, ___ A.2d ___ (1999) (pancreatic injury creating risk of death and injury to left temporarily impairing vision was serious physical injury); State v.Sewell, 38 Conn. App. 20, 24, 658 A.2d 598, cert. denied, 234 Conn. 918,661 A.2d 98 (1995) (blow to head rendering victim unconscious, held, serious physical injury); State v. Rumore, 28 Conn. App. 402,613 A.2d 1328, cert. denied, 224 Conn. 906, 615 A.2d 1049 (1992) (same);State v. Dickson, 10 Conn. App. 462, 465, 523 A.2d 935 91987) (serious physical injury need not be permanent injury) Moreover, the court finds by clear and convincing evidence that the respondent committed severe physical abuse of Michael, denying him the care necessary for his physical well-being.
The court further finds by clear and convincing evidence that the remaining fracture or fractures to Michael's head, which also were serious physical injuries, were inadequately explained by the respondent. This is so for two reasons. First, the remaining fracture or fractures did not occur on September 11, 1998, as the respondent claimed. They and their sequelae, principally the subdural hematoma, were caused earlier. Secondly, as Dr. Spivack explained, it is utterly unlikely that they could have been caused in the manner claimed by the respondent. They required the application of force by another person, either an adult or adolescent.
For the reasons discussed in part I B of this opinion, the court also finds by clear and convincing evidence that the respondent, the children's caretaker, deliberately and nonaccidentally caused the CT Page 356 contusion to Michael's spleen. As Dr. Spivack testified, this too was a serious physical injury with which is associated a high degree of mortality in an infant of three months.
Moreover, the court finds by clear and convincing evidence that the respondent, through acts of parental omission, neglected Michael by denying him the care necessary for his emotional and physical well being. Specifically, the respondent ignored Michael's hygience and left him lying alone for unduly protracted periods of time resulting in social and emotional deprivation and the flattening of his occipital area.
Finally, the court finds by clear and convincing evidence that through acts of both commission and omission, the respondent committed a pattern of abuse. The skull fractures and the contusion to the spleen occurred at least two different occasions and required at least three distinct acts. Moreover, the neglect of Michael's hygiene and his emotional well-being necessarily occurred over a period of time.
The court finds by clear and convincing evidence that there are grounds to terminate the respondent's parental rights with respect to Michael pursuant to General Statutes § 17a-112(c)(C). In sum, Michael was denied, by reason of acts of parental commission or omission committed by the respondent, including severe physical abuse and a pattern of abuse, the care necessary for his physical and emotional well-being.
 C. 
DCF seeks to terminate the respondent's parental rights with respect to her other son, Clark, pursuant to General Statutes § 17a-112(c)(F). General Statutes § 17a-112(c)(F) provides in pertinent part that parental rights may be terminated where the court finds by clear and convincing evidence that "the parent . . . has committed an assault, through deliberate, nonaccidental act that resulted in serious bodily injury of another child of the parent. . . ." Under this portion of the statute, a court may terminate the parental rights of a parent with respect to a child if the court finds by clear and convincing evidence chat the parent (a) has committed an assault, (b) through a deliberate and (c) nonaccidental act (d) that resulted in serious bodily injury to another child of the parent. "There is no requirement in § 17a-112
that there must be a finding of immediate physical danger to the child before parental rights can be terminated." In re Joshua Z.,26 Conn. App. 58, 62, 597 A.2d 842, cert. denied, 221 Conn. 901,600 A.2d 1028 (1991).
The first requirement is chat the parent have assaulted the child "As a term of art, `assault' may denote either a civil assault or a criminal CT Page 357 assault. A civil assault is the intentional causing of imminent apprehension of harmful or offensive contact in another. 1 Restatement (Second), Torts § 21." DeWitt v. John Hancock Mutual Life Ins. Co.,5 Conn. App. 590, 594, 501 A.2d 768 (1985). Since the legislature did not see fit to incorporate the statutory definition of assault in the Penal Code, it is presumed that it intended the common law definition of civil assault to apply.
of course, "[i]t is clear that [a] parent, being charged with the training and education of his child, has the right to exercise such control and restraint and to adopt such disciplinary measures for the child as will enable him to discharge his parental duty. . . . Limits on the right of parents to punish their children do, however, exist. The common law rule . . . require[s] that the use of physical force administered upon a minor child be reasonable. . . . Whether that limit has been reached in any particular case is a factual determination to be made by the trier of fact." State v. Leavitt, 8 Conn. App. 517, 522,513 A.2d 744, cert. denied, 201 Conn. 810, 516 A.2d 886 (1986). Slamming a three month infant's head against the floor to such an extent as to cause a skull fracture far exceeds that limit. See id., 518-20. By clear and convincing evidence the court finds that the respondent committed an assault on Michael.
Next, § 17a-112(c)(F) requires that the assault must have occurred through a deliberate and nonaccidental act. "Deliberate" is defined as "characterized by or resulting from careful and thorough consideration . . . characterized by awareness of the consequences. . . ." Merriam Webster's Collegiate Dictionary (1996). This definition does not require that a protracted period of time elapse between the inception of the deliberation and the commission of the act. Here, the court finds that Michael had suffered at least one prior skull fracture in the care of his mother prior to September 11, 1998. The respondent was a high school graduate, had been employed at a beauty salon and at a bank. She did not use drugs or alcohol. She was clearly aware of the consequences when she slammed her son's head against the floor. She committed this heinous act either to vent her own frustrations, to punish her son or to silence him. The court finds that this was a "deliberate" act.
General Statutes § 17a-112(c)(F) further requires that the assault by the parent be a "nonaccidental act." For the same reasons that her act was deliberate, and as found in part II B, supra the respondent's act was nonaccidental.
Finally, the respondent's assault must have resulted in serious bodily injury. A bodily injury is "a localized abnormal condition of the living body." Linnane v. Aetna Brewing Co., 91 Conn. 158, 162, 99 A. 507
CT Page 358 (1916). The fracture to Michael's head was a localized abnormal condition and, as discussed in part II B, supra, it was serious.
By clear and convincing evidence, the court finds that the respondent committed an assault, through a deliberate, nonaccidental act that resulted in serious bodily injury to her son Michael. Therefore, pursuant to General Statutes § 17a-112(c)(F) there are grounds to terminate the respondent's parental rights with respect to her son Clark.
 C. 
"As cart of the adjudication process, § 17a-112(c)(1) requires that the court find by clear and convincing evidence that `the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts. . . .'
"Before a termination of parental rights can be granted, the trial court must be convinced that the department has made reasonable efforts to reunite the child with his or her family. . . . The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. . . . [R]assignable efforts means doing everything reasonable, not everything possible. . . ." (Citations omitted; footnote omitted; internal Quotation marks omitted.) In re Tabitha T., 51 Conn. App. 595,599-600, 722 A.2d 1232 (1999).
DCF referred the respondent to the Waterbury Youth Services Family for individual and parenting counseling and to Connecticut Counseling for alcohol and drug assessment. At the Waterbury Youth Services, the respondent also participated in a "coping with loss" class and an anger awareness and action support group. DCF did not provide visitation between the respondent and her children because the court order releasing her from custody in connection with the criminal charges against her forbade visitation. Notably, the respondent never objected to or disputed this condition of her release or sought to modify it. See Practice Book §§ 38-11, 38-13, 38-17.[8]
The respondent has not raised an issue as to whether DCF made reasonaple efforts to reunite her with her children. By clear and convincing evidence, the court finds that DCF made such efforts.
 E. 
"In the dispositional phase of a termination of parental rights CT Page 359 hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven factors delineated in § 17a-112 (d)." In reTyscheicka H., 61 Conn. AppApp. 19, 26, ___ A.2d ___ (2000).[9]
 Mandatory § 17a-112(d) Findings
1. Finding regarding the timeliness, nature and extent of services offered, provided, and made available to the parent and the child by a child-placing agency to facilitate the reunion of the child with the parent.
Soon after taking custody of Michael, DCF referred the respondent to Waterbury youth Services for individual counseling and parenting classes, and to Connecticut Counseling for alcohol and drug assessment. While these services were substantial, it also would have been appropriate to have referred the respondent for more intensive psychiatric treatment.
2. Finding regarding whether DCF has made reasonable efforts to reunite the family pursuant to the Federal Child Welfare Act of 1980, as amended.
As found in part II D of this opinion, DCF made reasonable efforts to reunite the family, given the chilling circumstances of this case and the court-ordered prohibition of contact between mother and children.
3. Finding regarding the terms of any applicable court order entered into and agreed upon by any individual or child-placing agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
On September 25, 1998, the court ordered that the respondent keep all appointments set by or with DCF; that she keep here whereabouts known to DCF and to her attorney; that she visit her children as often as DCF permitted; that she participate in parenting counseling, individual counseling (including anger management and domestic violence counseling) and drug and alcohol evaluation; that she cooperate with random drug screens or tests; that she follow recommendations; that she accept and cooperate with in home support services referred by DCF; that she sign releases authorizing DCF to cooperate with service providers to monitor her attendance, cooperation and progress; that she secure and maintain adequate housing and legal income; that she not engage in substance abuse; that she have no involvement with the criminal justice system; and CT Page 360 that she cooperate with any existing court order.
DCF has not proven that the respondent failed to fulfill these requirements.
4. Finding regarding the feelings and emotional ties of the child with respect to the child's parents, any guardian of the child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
After more than two years without seeing their mother the children have little or no memory of her. On the other hand, the children have a close and loving relationship with their foster parents, with whom they have been living for two years. The children perceive their foster parents, who "definitely" want to adopt them, as their psychological parents and refer to them as "mom" and "dad."
5. Finding regarding the age of the child.
At the time of trial, Clark was three years of age and Michael was 2 1/2 years.
6. Finding regarding the efforts the parent has made to adjust such parent's circumstances, conduct or conditions to make it in the best interest of the child to return the child to the parent's home in the foreseeable future, including, but not limited to: (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent; provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of he child.
The respondent consistently attended the programs to which DCF referred her, receiving certificates for perfect attendance for Waterbury Youth Services' coping with loss classes and its anger awareness and action support group.
Between September and December, 1998, the respondent requested DCF to arrange visitation with her children, and regularly and respectfully inquired about her children's welfare. She also sent them gifts on Christmas and birthdays. However, a condition of her pre-trial release was that she have no contact with her children. The respondent could have challenged the condition before her release. She also could have requested of the court that she remain incarcerated rather than be prohibited from contact with her children. It is not unusual for DCF to CT Page 361 afford supervised visitation for prison inmates. See, e.g., In re ShaneP., 58 Conn. App. 234, 241, 248, ___ A.2d ___ (2000); In re Hector L.,53 Conn. App. 359, 372, 730 A.2d 106 (1999); In re Michael M.,29 Conn. App. 112, 116 614 A.2d 832 (1992). Finally, the respondent could have subsequently requested modification of the condition that she have no contact with her children. She took none of these steps.
On December 31, 1998, the respondent informed DCF she would have no further contact with the department. She has not seen her children since September 11, 1998.
7. Finding regarding the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child or the unreasonable act of any other person or by the economic circumstances of the parent.
Neither parent has been prevented from maintaining a meaningful relationship with the children by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent.
"In addition, the genetic bond shared by a biological parent and his or her child, although not determinative of the issue of the best interest of the child, is certainly a factor to consider. . . ." (Internal quotation marks omitted.) In re Savanna M., 55 Conn. App. 807, 816,740 A.2d 484 (1999). The court has considered this factor.
"Conducting a best interest analysis is not a narrow concept restricted to a compelling reason or to fully reuniting the parent with the child. Rather, it is Purposefully broad to enable the trial court to exercise its discretion based upon a host of considerations." (Internal quotation marks omitted.) In re Alissa N., 56 Conn. App. 203, 208, 742 A.2d 415
(1999). The court has weighed all relevant considerations.
It would not serve the children's best interests to reintroduce into their lives a parent who they have not seen in over two years and who has taken no steps to remove the condition of pre-trial release forbidding her from having contact with them. Nor would it serve the children's interests to force them, in these circumstances and given their ages, to languish in foster care. The Appellate Court has "consistently held that allowing a child to languish in foster care .s not in the child's best interest." In re Savanna M., supra, 55 Conn. App. 814. The court finds by clear and convincing evidence that it is in the children's best interests that their mother's parental rights be terminated. CT Page 362
 III 
The father has consented to the termination of his parental rights with respect to both Michael and Clark. General Statutes § 17a-112(b) provides that the court "may grant a petition for termination of parental rights based on consent filed pursuant to this section if it finds that (1) upon clear and convincing evidence, the termination is in the best interest of the child and (2) such parent has voluntarily and knowingly consented to termination of his parental rights with respect to such child." Although the foster parents have allowed and the father has exercised some visitation with his sons, the evidence is that they have little attachment to him. The court finds upon clear and convincing evidence that termination of the father's parental rights is in the best interests of the children and that the father has voluntarily and knowingly consented to the termination of his parental rights with respect to both children.
 IV 
The petition is granted as to both respondents. The court terminates the respondents' parental rights. It is further ordered that the Commissioner of the Department of Children and Families is appointed statutory parent for Michael and Clark for the purpose of securing a permanent adoptive family for them. If Mr. and Mrs. L., the foster parents, are willing to adopt both boys, as they testified, it is the court's order that they receive first consideration. The commissioner shall file with this court no later than 90 days following the date of this judgment a written report of efforts undertaken to effect such a permanent placement for both children and shall file further reports as are required by state and federal law.
Dated at Middletown this 5th day of January, 2001.
BY THE COURT
Bruce L. Levin Judge of the Superior Court